UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) ) ) | |
| - v. - | ) ) | 22 Cr. 251 (LJL) |
| RAFAEL MARTINEZ, | ) ) | ORAL ARGUMENT REQUESTED |
| Defendant. | ) ) ) | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT
RAFAEL MARTINEZ'S MOTION TO DISMISS
COUNT ONE OF THE INDICTMENT**

Dated: December 2, 2022
  New York, New York

MORVILLO, ABRAMOWITZ
GRAND, IASON & ANELLO, P.C.
Elkan Abramowitz
Telemachus P. Kasulis
Russell J. Feldman
565 Fifth Avenue
New York, New York 10017

WILLKIE FARR & GALLAGHER LLP
Michael S. Schachter
Randall Jackson
787 Seventh Avenue
New York, New York 10019

*Attorneys for Defendant Rafael Martinez*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................................ ii

PRELIMINARY STATEMENT ........................................................................................................ 1

STATEMENT OF FACTS ................................................................................................................. 1

ARGUMENT ...................................................................................................................................... 2

  I.    Count One Must Be Dismissed Because It Fails to Allege a Scheme to
        Defraud a Victim of Property Under Binding Supreme Court Precedent .................... 2

        A.    *Relevant law* ........................................................................................................... 2

              1.   Background on the "property" requirement in wire fraud cases .......................... 2

              2.   The *Cleveland* doctrine and *Kelly v. United States* ................................................ 5

        B.    *Discussion* ................................................................................................................ 9

CONCLUSION ................................................................................................................................. 13

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Carpenter v. United States*,
484 U.S. 19 (1987)................................................................................................ 4, 5, 9

*Cleveland v. United States*,
531 U.S. 12 (2000)................................................................................................ passim

*Fasulo* v. *United States*,
272 U.S. 620 (1926).............................................................................................. 12

*Fountain v. United States*,
357 F.3d 250 (2d Cir. 2004)................................................................................. 3

*Hammerschmidt v. United States*,
265 U.S. 182 (1924).............................................................................................. 4

*Kelly v. United States*,
140 S. Ct. 1565 (2020).......................................................................................... 1, 3, 8, 9

*McNally v. United States*,
483 U.S. 350 (1987).............................................................................................. 3, 4, 12

*Skilling v. United States*,
561 U.S. 358 (2010).............................................................................................. 4

*Toulabi v. United States*,
875 F.2d 122 (7th Cir. 1989) ............................................................................... 6

*United States v. Dadanian*,
856 F.2d 1391 (9th Cir. 1988) ............................................................................. 6

*United States v. Evans*,
844 F.2d 36 (2d Cir. 1988).................................................................................... 3, 9

*United States v. Granberry*,
908 F.2d 278 (8th Cir. 1990) ............................................................................... 6

*United States v. Murphy*,
836 F.2d 248 (6th Cir. 1988) ............................................................................... 6

*United States v. Pierce*,
224 F.3d 158 (2d. Cir. 2000)................................................................................ 5

*United States v. Pirro*,
     212 F.3d 86 (2d Cir. 2000)..................................................................................... 2

*United States* v. *Sadler*,
     750 F.3d 585 (6th Cir. 2014) (Sutton, J.)............................................................ 12

*United States v. Schwartz*,
     924 F.2d 410 (2d Cir. 1991)............................................................................ 6, 9

*United States v. Shotts*,
     145 F.3d 1289 (11th Cir. 1998) ........................................................................... 6

## Statutes

15 U.S.C. § 645(a) ................................................................................................. 2, 10

18 U.S.C. § 1343..................................................................................................... 2, 3

18 U.S.C. § 1346........................................................................................................ 12

## Other Authorities

CARES Act Section 1102 Lender Agreement – Non-Bank and Non-Insured
     Depository Institution Lenders ........................................................................ 10

Petition for a Writ of Certiorari,
     *Ciminelli v. United States*, (No. 21-1170) (filed Feb. 18, 2022),
     *available at* 2022 WL 566444 ........................................................................... 5

## Rules

Fed. R. Crim. P. 12(b)(3)(B)(v) ...................................................................................... 2

**PRELIMINARY STATEMENT**

This case presents yet another attempt by the government to expand the definition of "property" in the federal wire fraud statute beyond the bounds approved by Congress and the Supreme Court. In essence, the government's theory in Count One of the Indictment is that Rafael Martinez made misrepresentations to the Small Business Administration in connection with an application he submitted for his company to become a non-bank lender under the Paycheck Protection Program. Even if true, this conduct would not be wire fraud. Despite the Supreme Court's repeated admonishments that the government not read the "property" element of the wire fraud statute broadly, the prosecution's theory of government imprimatur as "property" in this case is nearly identical to the approach rejected by the Supreme Court in *Cleveland v. United States*, 531 U.S. 12 (2000) and *Kelly v. United States*, 140 S. Ct. 1565 (2020). For the same reasons the Court rebuffed the government in those cases, Count One must be dismissed.

**STATEMENT OF FACTS**

In March 2020, the COVID-19 pandemic profoundly disrupted all American businesses, regardless of size or ownership. In response, the United States government quickly made available massive financial relief to businesses and individuals around the country. Among other emergency measures, the government created the Paycheck Protection Program (the "PPP") to provide funds to businesses so that they could continue to pay salaries and certain other expenses. Mr. Martinez successfully applied for his company, MBE Capital Partners, to become a non-bank lender under PPP.

As relevant here, Count One of the Indictment charges Mr. Martinez with wire fraud in connection with his role in seeking Small Business Administration ("SBA") approval of MBE as a non-bank lender. *See* Indictment ¶ 1, *United States v. Martinez*, 22-cr-251-LJL, ECF No. 18. Count Two charges Mr. Martinez with the related crime of making false statements to the SBA in

connection with the MBE application, pursuant to 15 U.S.C. § 645(a). *Id.* at ¶ 2. The remaining counts of the Indictment are unrelated to the request for SBA approval of MBE as a non-bank lender and focus on a PPP loan that MBE itself received. Mr. Martinez has pled not guilty to all counts of the Indictment and disputes these charges.

**ARGUMENT**

In Count One of the Indictment, the government alleges that Mr. Martinez made materially false statements and omissions "to fraudulently obtain the approval of the [SBA] for [MBE] to be a non-bank lender through the [PPP], and then MARTINEZ used that approval to obtain millions of dollars in capital to issue PPP loans and earn lender fees." Indictment ¶ 1, ECF No. 18. This allegation is squarely foreclosed by Supreme Court precedent. Even accepting the factual assertions in the Indictment as true, as the Court must on a motion to dismiss, Count One is defective because it fails to allege a deprivation of "property" cognizable by the federal wire fraud statute. 18 U.S.C. § 1343. Making material misstatements to a government body in order to obtain permission to operate a business—even a business that generates substantial profits—is not wire fraud because government imprimatur is not "property." Because Count One on its face therefore "fail[s] to state an offense," it must be dismissed as a matter of law. Fed. R. Crim. P. 12(b)(3)(B)(v); see *United States v. Pirro*, 212 F.3d 86, 91-95 (2d Cir. 2000) (affirming partial dismissal of indictment for failing to allege essential element of offense).

I.     **Count One Must Be Dismissed Because It Fails to Allege a Scheme to Defraud a Victim of Property Under Binding Supreme Court Precedent**

    A.     *Relevant law*

        1.     Background on the "property" requirement in wire fraud cases

The federal wire fraud statute prohibits the knowing use of wire communications to effect "any scheme or artifice to defraud, or for obtaining money or property by means of false or

2

fraudulent pretenses, representations, or promises." 18 U.S.C. § 1343. The Supreme Court has read that "disjunctive language as a unitary whole," *Kelly v. United States*, 140 S. Ct. 1565, 1571 (2020), such that "'the money-or-property requirement of the latter phrase' also limits the former." *Id.* (quoting *McNally v. United States*, 483 U.S. 350, 358 (1987)). A conviction for wire fraud therefore requires not only that a defendant engaged in deception, but that an "object of the[] fraud [was] 'property.'" *Kelly*, 140 S. Ct. at 1571 (quoting *Cleveland v. United States*, 531 U.S. 12, 26 (2000)); *see also Fountain v. United States*, 357 F.3d 250 (2d Cir. 2004) ("[T]he essential elements of a mail or wire fraud violation are (1) a scheme to defraud, (2) money or property as the object of the scheme, and (3) use of the mails or wires to further the scheme.") (citation and brackets omitted)).

In an effort to prevent prosecutorial overreach, the Supreme Court has repeatedly held that the federal mail and wire fraud statutes are limited to schemes to deprive a victim of *traditional* "money or property." *Cleveland*, 531 U.S. at 18-19 (quoting *McNally*, 483 U.S. at 360). These statutes are not designed to criminalize "all acts of dishonesty" or "set[] standards of disclosure and good government for state and local officials." *Kelly*, 140 S. Ct. at 1571. Nor are they designed to proscribe every type of "wrongdoing[,] deception, corruption, [or] abuse of power." *Id.* at 1568. If there is no deprivation of classic "money or property," there is no crime. *Id.* at 1571.

"Money" largely speaks for itself. The question of what constitutes "property," however, has presented challenges for the federal courts. The Supreme Court has cautioned against reading this term broadly, observing that an expansion of the concept that "stray[s] from traditional concepts of property" would necessarily "approve a sweeping expansion of federal criminal jurisdiction in the absence of a clear statement by Congress." *Cleveland*, 531 U.S. at 24; *see also United States v. Evans*, 844 F.2d 36, 41 (2d Cir. 1988) (Second Circuit is "particularly loath to

3

expand the wire and mail fraud statutes further, since [it] ha[s] already tolerated an extraordinary expansion of these laws") (citation omitted).

Notwithstanding this guidance, the government has repeatedly tried to shoehorn novel theories of property into the mail and wire fraud statutes. In 1987, "[a]t the time *McNally* [*v. United States*, 483 U.S. 350 (1987)] was decided, federal prosecutors had been using [the mail fraud statute] to attack various forms of corruption that deprived victims of 'intangible rights' unrelated to money or property," such as the right to honest services of a government official. *Cleveland*, 531 U.S. at 18. *McNally* put an end to such prosecutions, "stopp[ing] the development of the intangible-rights doctrine in its tracks." *Skilling v. United States*, 561 U.S. 358, 401 (2010). After conducting a review of the history of the mail fraud statute, starting with its enactment in 1872, the Court concluded that "the original impetus behind the mail fraud statute was to protect people from schemes to deprive them of their money or property." *McNally*, 483 U.S. at 356. And despite later amendments to that statute in the early 1900s, Congress did not signal an intent that it "was departing from [the] common understanding" that "the words 'to defraud' commonly refer to 'wronging one in his property rights by dishonest methods or schemes[.]'" *Id.* at 358-59 (quoting *Hammerschmidt v. United States*, 265 U.S. 182, 188 (1924)). .

The next term, in *Carpenter v. United States*, the Supreme Court clarified that certain kinds of information could indeed be "property" under the mail and wire fraud statutes, but only where that information was of classic economic value to a private actor. 484 U.S. 19, 26 (1987). The Court in *Carpenter* stated that the property right in question in that case—confidential business information (in that case, belonging to the Wall Street Journal)—"has long been recognized as property." *Id.* As a result, the Court had "little trouble in holding that the conspiracy [t]here to

trade on the Journal's confidential information is not outside the reach of the mail and wire fraud statutes" and affirmed the convictions. *Id.* at 28.

But while the "confidential business information" in *Carpenter* was obviously of economic value to the victim Wall Street Journal—which had a financial interest in the content of forthcoming stories so as to sell papers—*Carpenter* left open the question of whether the calculus would be different if the supposed "victim" of the deception was a government entity. That question was answered thirteen years later in *Cleveland v. United States*, 531 U.S. 12 (2000).[1]

> 2.    The *Cleveland* doctrine and *Kelly v. United States*

The defendants in *Cleveland* engaged in a deceptive scheme to influence Louisiana's issuance of video poker gaming licenses. 531 U.S. at 16-17. The indictment charged that the defendants violated the federal mail fraud statute, 18 U.S.C. § 1341,[2] by fraudulently concealing that they were the true owners of the entity that submitted the initial application and subsequent renewal applications for those gaming licenses. *Id.* Allegedly, the defendants did so because they had tax and financial problems that could have undermined their suitability to receive the video poker licenses from the state government. *Id.* at 17.

---

[1] Another example of the Supreme Court's continued efforts to curb overreach on the "property" element of wire fraud will likely follow its decision in *Ciminelli v. United States*, in which the Court granted certiorari to scrutinize the ill-favored "right to control" theory of prosecution. *See* Petition for a Writ of Certiorari, at *i, *Ciminelli v. United States*, (No. 21-1170) (filed Feb. 18, 2022), *available at* 2022 WL 566444 ("Whether the Second Circuit's "right to control" theory of fraud—which treats the deprivation of complete and accurate information bearing on a person's economic decision as a species of property fraud—states a valid basis for liability under the federal wire fraud statute, 18 U.S.C. § 1343.").

[2] Because "[t]he mail and wire fraud statutes share the same language in relevant part," courts accordingly "apply the same analysis to both sets of offenses[.]" *Carpenter*, 484 U.S. at 25 n. 6 (1987); *see also United States v. Pierce*, 224 F.3d 158, 165 n.5 (2d. Cir. 2000) ("[T]he wire fraud statute . . . is the lineal descendant of the mail fraud statute . . . and because these statutes use the same relevant language, they are analyzed in the same way.") (quotations and internal citations omitted)).

Prior to trial, Cleveland moved to dismiss the mail fraud counts on the ground that the alleged fraud did not deprive the government of "property" under the federal mail fraud statute. The district court denied the motion and held that the "licenses constitute[d] property even before they are issued." *Id*. at 17. On appeal, Cleveland again asserted that the government lacked a property interest in the video poker licenses, citing to several appeals court cases concluding that the government does not relinquish property under the mail fraud statute when it issues permission to conduct a business. *Id.* at 17-18.[3] The Fifth Circuit nevertheless affirmed, as it considered itself bound by prior precedent that the video poker licenses constituted property in the hands of the state government. *Id*. at 18.

The Supreme Court reversed. *Id*. at 18. It held that, for purposes of the federal mail fraud statute, a state does not part with "property" when it issues a license because such a license is not "property" in the state's hands. *Id*. at 20. In so holding, the Court identified several considerations that guided its determination that the unissued licenses were not "property" for purposes of the federal mail fraud statute.

First, the Court drew a clear distinction between the state's regulatory interests and property. The Court noted that the state's right to control the government approval of regulated business—or as described by the Fifth Circuit, the state's "right to choose the persons to whom it issues . . . licenses"—was not an interest that "has long been recognized as property." *Id*. at 23. Rather, the Court concluded that the state's "intangible rights of allocation, exclusion, and control amount to no more and no less than" the state's "sovereign power to regulate." *Id.* at 23. The Court

---

[3] *See United States v. Shotts*, 145 F.3d 1289, 1296 (11th Cir. 1998) (license to operate a bail bonds business); *United States v. Schwartz*, 924 F.2d 410, 418 (2d Cir. 1991) (arms export license); *United States v. Granberry*, 908 F.2d 278, 280 (8th Cir. 1990) (school bus operator's permit); *Toulabi v. United States*, 875 F.2d 122, 125 (7th Cir. 1989) (chauffeur's license); *United States v. Dadanian*, 856 F.2d 1391, 1392 (9th Cir. 1988) (gambling license); *United States v. Murphy*, 836 F.2d 248, 254 (6th Cir. 1988) (license to conduct charitable bingo games).

noted that these rights include the "distinctively sovereign authority to impose criminal penalties for violations of the licensing scheme." *Id*. at 23. Because the state's interest in licensing video poker operations "implicates the Government's role as sovereign" but not its role as "property holder," the defendant's false statements did not deprive the state of property. *Id*. at 23-24.

Second, the Court found that the state's substantial economic interest in the video poker industry did not convert the unissued licenses into "property." Although the state collected various processing, annual, and device operation fees, as well as a fixed percentage of the net revenue from each video poker machine, the state "receive[d] the lion's share of its expected revenue not while the licenses remain in its own hands, but only after they have been issued to licensees." *Id.* at 22. The Court added that the licenses prior to their issuance do not generate an ongoing stream of revenue for the state and, at most, afford the state the opportunity to collect a processing fee from applicants for new licenses. *Id.* The Court observed that if having an economic stake in receiving fees from new applicants were sufficient to establish a property right, then it is ineluctable that the state would have property rights in any type of license (e.g. drivers' licenses, fishing and hunting licenses, medical licenses), which the state conceded were "purely regulatory." *Id.* The Court observed that "it does not suffice . . . that the object of the fraud may become property in the recipient's hands; for purposes of the mail fraud statute, the thing obtained must be property in the hands of the victim." *Id.* at 15 (emphasis added).

Third, the Court stated that the state's right to exclude applicants deemed unsuitable to run video poker operations does not convert the unissued licenses into "property." *Id.* at 23. The Court noted that notwithstanding this right to exclude, the state did not conduct gaming operations itself, did not hold the licenses to reserve the right to do so, and did not sell the licenses. *Id.* Moreover, the state could not sell its licensing authority. *Id.* As a result, the Court rejected the government's

argument that that the state's interest in its video poker licenses is like a patent holder's interest in an unlicensed patent, and found that the state's interest in unissued licenses was better analogized to the federal government's interest in an unissued patent—which "implicates the Government's role as sovereign, not as a property holder." *Id.* at 23-24.

In sum, the Court declined to adopt the state's theories because they "stray[ed] from traditional concepts of property." *Id.* at 24. Doing so, in the Court's opinion, would "approve a sweeping expansion of federal criminal jurisdiction in the absence of a clear statement by Congress." *Id.* Therefore, the Court rejected the government's effort to "[e]quat[e] [the] issuance of licenses or permits with deprivation of property[.]" *Id.*

*Cleveland* does not stand alone. The Supreme Court revisited this issue two years ago in *Kelly v. United States*, 140 S. Ct. 1565, 1571 (2020). In that case, the Court reversed wire fraud convictions for two New Jersey officials who lied in order to achieve their goal of reallocating several toll lanes leading to the George Washington Bridge as part of a scheme to exact political payback against a local mayor. *Id.* at 1568-69. The Court noted that the officials' actions were a "corrupt act" and an "abuse of power," but nevertheless held that they could not support convictions for wire fraud because the scheme did not "aim to obtain money or property." *Id.* at 1574. The Court decided that the realignment of the toll lanes—"in effect" a decision "about which drivers had a 'license' to use which lanes"—was instead "a quintessential exercise of regulatory power." *Id.* at 1572-73. Citing *Cleveland*, the Court stated that it "ha[d] already held that a scheme to alter such a regulatory choice is not one to appropriate the government's property." *Id.* at 1573. And while the Court acknowledged that a scheme to deprive the government of its right to its employees' time and labor would be a scheme to take the government's property, this was not the object of the scheme in *Kelly*; it was merely an incidental byproduct of the defendants' scheme to

alter a regulatory choice and therefore was not a property right that could support a prosecution for wire fraud. *Id.* at 1573-74.[4]

B.    *Discussion*

In Count One of the Indictment, the government alleges that Mr. Martinez used false pretenses, representations, and documents to "fraudulently obtain the approval of the [SBA] for his company, [MBE], to be a non-bank lender through the [PPP], and then . . . used that approval to obtain millions of dollars in capital to issue PPP loans and earn lender fees." Indictment ¶ 1, ECF No. 18. Even accepting these allegations as true, this Count is barred by *Cleveland* and *Kelly*.

Read plainly, the Indictment appears to assert that Mr. Martinez deprived the SBA of its right to approve (or to disapprove) his company to be a non-bank lender through the PPP (and then used that approval to "obtain millions of dollars in capital"). The SBA's right to approve an applicant as a non-bank lender under the PPP—like Louisiana's right to control what individuals and entities could operate video poker machines in the state—is not a right that "has long been recognized as property." *Cleveland*, 531 U.S. at 23 (quoting *Carpenter*, 484 U.S. at 26. To the contrary, the SBA's right to approve or disapprove an applicant as a non-bank lender is akin to the state's "intangible rights of allocation, exclusion, and control" that the *Cleveland* Court deemed to

---

[4] The notion that government decision making is not "property" did not begin with *Cleveland* or *Kelly*, or with the Supreme Court. In *United States v. Evans*, the Second Circuit evaluated whether the government's "right to control alienation of [] weapons" might be considered a property right for federal fraud purposes. 844 F.2d 36, 40 (2d Cir. 1988). In that case, the defendants were charged with conspiring to deceive the United States about the true identity of the country purchasing arms in order to obtain the necessary government approval for a transaction. *Id.* at 37. The Second Circuit held that the government's right to control future alienation of arms—in other words, the government's right to prevent the resale of U.S. military weaponry from acceptable to unacceptable foreign nations—was not property for purposes of federal wire and mail fraud. *Id.* at 42.

Similarly, in *United States v. Schwartz*, the Second Circuit held that unissued licenses do not constitute "property" in the hands of the government. 924 F.2d 410, 417-18 (2d Cir. 1991). The Court noted that "*Evans* cannot be distinguished on the basis that the fraudulently obtained government approval in this case was embodied in a license. What was fraudulently obtained in both cases was the government's agreement to allow the proposed transactions to take place." *Id.* at 417. The Court determined that "a regulatory license is nothing more than a formal embodiment of 'the necessary government approval,'" and that such government approval cannot be property. *Id.*

"amount to no more and no less than [the government's] sovereign power to regulate." *Cleveland*, 531 U.S. at 23.

The SBA's right to approve an applicant to become a non-bank lender shares many characteristics with Louisiana's right to sanction applicants in *Cleveland*. At the outset, both interests are comprised of the intangible rights to allocate, exclude, and control which applicants could participate in the programs offered. These interests reflect "paradigmatic exercises of the [government's] traditional police powers" or regulatory powers, not "property" interests. *Cleveland*, 531 U.S. at 23. Reflecting this fact, both interests include the "distinctively sovereign authority to impose criminal penalties for violations of the licensing" or approval regimes, including for false statements. *Id*. Just as Louisiana had the sovereign authority to impose criminal penalties for making false statements in a license application, the federal government here has the sovereign authority to impose criminal and civil penalties under certain federal statutes for making false statements to the SBA in an application to become a non-bank lender.[5] Tellingly, the SBA's own agreement with prospective non-bank lenders omits any reference to 18 U.S.C. § 1343 when requiring applicants to acknowledge that false statements made to the SBA or the Department of Treasury can result in criminal prosecution or the imposition of civil penalties. *See* CARES Act Section 1102 Lender Agreement – Non-Bank and Non-Insured Depository Institution Lenders, at p. 6, available at www.sba.gov/sites/default/files/2021-04/SBA-Form-3507-PPP--Agreement-for-New-Lenders-Non-Bank-Non-Insured-Depository-Institution-Lenders%20%28revised%204-9-21%29-508.pdf ("I further acknowledge that any false statements made to the U.S. Small Business Administration and Department of Treasury can result in criminal prosecution under 18 U.S.C.

---

[5] The government is obviously aware of this statutory framework, given that it has charged Mr. Martinez with making false statements to the SBA in Count Two of the Indictment. *See* 15 U.S.C. § 645(a); Indictment ¶ 2, ECF No. 18.

1001, 15 U.S.C. 645, and other provisions and imposition of civil money penalties under 31 U.S.C. 3729."). Therefore, the SBA's right to approve applicants as non-bank lenders under the PPP is best understood as part of the SBA's regulatory interests, not "property" under the ambit of the federal wire fraud statute.

Moreover, that the SBA may have an economic interest in the PPP program is not sufficient to convert its approval (or disapproval) into "property" in the hands of the SBA. At the outset, it is not clear that the SBA had an economic interest in the PPP program akin to that possessed by Louisiana with respect to its video poker licenses. Under the Coronavirus Aid, Relief, and Economic Security Act (the CARES Act), the PPP was a new program added to the SBA's 7(a) Loan Program. The CARES Act provided for the SBA to guarantee loans under the PPP, but it also provided for full forgiveness of up to the principal amount of qualifying loans. As such, the PPP was designed to provide funds to qualified businesses, and so long as those funds were used as designated by the recipient, those loans were *designed to be completely forgiven by the SBA*. Furthermore, the SBA did not receive fees for originating or providing these loans.

Even if the SBA did have an economic interest in the PPP program, however, the Indictment does not allege that Mr. Martinez defrauded the SBA of any money or property to which it was entitled by law. Although the Indictment asserts that Mr. Martinez used MBE's non-bank lender approval to obtain millions of dollars in capital to issue PPP loans and earn lender fees, Indictment ¶ 1, ECF No. 18, that capital and fees flowed from Mr. Martinez's proper participation in the program *once approved*. As the defendants did in *Cleveland* by paying the amounts rightly owed to the state after they obtained the video poker licenses—once he was approved as a non-bank lender, Mr. Martinez carried out the tasks of a non-bank lender. Specifically, he processed loans he received from small, minority-owned businesses, received and

11

immediately disbursed funds as required under the program, and received lender fees for doing so (just as any other non-bank lender (or any bank lender) would receive for doing so).

Congress could, if it so chooses, criminalize conduct under the wire fraud statute that goes beyond conduct that deprives a victim of "money or property." Indeed, Congress has done so—directly in response to Supreme Court rulings—in other contexts. *See, e.g.*, 18 U.S.C. § 1346 (redefining wire and mail fraud to include a deprivation of honest services after *McNally*). But Congress has taken *no action* to abrogate the holdings in *Cleveland* and *Kelly*. "Congress's reverberating silence about other intangible interests tells us all we need to know." *United States v. Sadler*, 750 F.3d 585, 591 (6th Cir. 2014) (Sutton, J.) (holding that a defendant's fabrications to pill distributors, though objectionable and punishable under other statutes, fell outside the wire fraud statute because depriving the distributors of the "ethereal right to accurate information" is not a deprivation of property). Indeed, Congressional silence also directs courts to adopt a more lenient reading of the wire fraud statute. *Id.* at 592. "[W]hen there are two rational readings of a criminal statute, one harsher than the other, we are to choose the harsher only when Congress has spoken in clear and definite language." *McNally*, 483 U.S. at 359-60. As a result, while "[m]oney, property, and the intangible right of honest services clearly and definitely fall within the fraud statutes' scope, [] other interests—such as the right to accurate information—do not." *Sadler*, 750 F.3d at 592 (internal quotation marks omitted).

*    *    *

In the context of the federal mail fraud statute, the Supreme Court has stated that "[t]here are no constructive offenses; and before one can be punished, it must be shown that his case is plainly within the statute." *McNally*, 483 U.S. at 360 (quoting *Fasulo* v. *United States*, 272 U.S. 620, 629 (1926)). "Rather than construe the statute in a manner that leaves its outer boundaries

12

ambiguous . . . , we read [the federal mail fraud statute] as limited in scope to the protection of property rights. If Congress desires to go further, it must speak more clearly than it has." *Id.*

Plainly, Congress has not done so. Mr. Martinez could only violate the federal wire fraud statute if the object of his alleged deception was the SBA's "property." Because the SBA was allegedly deprived of the right to approve a non-bank lender application—a regulatory power that has not "long been recognized as property," *Cleveland,* 531 U.S. at 23—Count One of the Indictment fails to state an offense under the federal wire fraud statute and must be dismissed.

## CONCLUSION

For the foregoing reasons, the Court should dismiss Count One of the Indictment against Mr. Martinez.

Dated: December 2, 2022
      New York, New York

> MORVILLO, ABRAMOWITZ
> GRAND, IASON & ANELLO, P.C.
>
> By:  /s/ Telemachus P. Kasulis
>        Elkan Abramowitz
>        Telemachus P. Kasulis
>        Russell J. Feldman
>        565 Fifth Avenue
>        New York, New York 10017
>
> WILLKIE FARR & GALLAGHER LLP
>        Michael S. Schachter
>        Randall Jackson
>        787 Seventh Avenue
>        New York, New York 10019
>
> *Attorneys for Defendant Rafael Martinez*

13