UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

v.

RAFAEL MARTINEZ,

Defendant.

**22 Cr. 251 (LJL)**

**THE GOVERNMENT'S BRIEF IN OPPOSITION
TO DEFENDANT'S MOTION TO DISMISS COUNT ONE**

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
One Saint Andrew's Plaza
New York, New York 10007

Micah F. Fergenson
Katherine Reilly
Assistant United States Attorneys
– Of Counsel –

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................... 3

BACKGROUND ....................................................................................................................... 3

   A. The Offense Conduct ........................................................................................................ 3

      1. Overview.......................................................................................................................... 3

      2. Background on the PPP Program.................................................................................... 4

      3. The PPP Loan Scheme.................................................................................................. 5

      4. The PPP Lender Scheme .............................................................................................. 6

   B. Procedural History ............................................................................................................ 8

DISCUSSION............................................................................................................................ 8

   I. THE DEFENDANT'S MOTION TO DISMISS COUNT ONE SHOULD BE DENIED. .... 8

      A. Applicable Law ............................................................................................................ 9

         1. Pleading Standards..................................................................................................... 9

         2. Wire Fraud ................................................................................................................ 10

      B. Discussion .................................................................................................................... 11

CONCLUSION......................................................................................................................... 16

# TABLE OF AUTHORITIES

**Cases**

*Costello v. United States*, 350 U.S. 359 (1956) .......................................................................... 9, 15

*Fountain v. United States*, 357 F.3d 250 (2d Cir. 2004) ................................................................ 11

*Hamling v. United States*, 418 U.S. 87 (1974) .......................................................................... 9, 12

*Kelly v. United States*, 140 S. Ct. 1565 (2020) .............................................................................. 11

*McNally v. United States*, 483 U.S. 350 (1987) ............................................................................. 11

*United States v. Aleynikov*, 676 F.3d 71 (2d Cir. 2012) ................................................................. 10

*United States v. Bastian*, 770 F.3d 212 (2d Cir. 2014) .................................................................. 12

*United States v. Christopher*, 142 F.3d 46 (1st Cir. 1998) ............................................................ 14

*United States v. De La Pava*, 268 F.3d 157 (2d Cir. 2001) ........................................... 9, 10, 13, 15

*United States v. Gatto*, 295 F. Supp. 3d 336 (S.D.N.Y. 2018) ...................................................... 15

*United States v. Greenberg*, 835 F.3d 295 (2d Cir. 2016) ....................................................... 11, 14

*United States v. Hernandez*, 980 F.2d 868 (2d Cir. 1992) ............................................................. 10

*United States v. Navarro*, 551 F. Supp. 3d 380 (S.D.N.Y. 2021) .................................................. 12

*United States v. Pham*, No. 12 Cr. 423 (AJN), 2022 (S.D.N.Y. Apr. 1, 2022) .................... 10, 15

*United States v. Stavroulakis*, 952 F.2d 686 (2d Cir. 1992) ............................................... 10, 12, 13

*United States v. Stringer*, 730 F.3d 120, (2d Cir. 2013); ............................................................... 12

*United States v. Walsh*, 194 F.3d 37 (2d Cir. 1999); ..................................................................... 12

*United States v. Zarrab*, No. 15 CR 867 (RMB), 2016 (S.D.N.Y. Oct. 17, 2016) .......................... 9

## PRELIMINARY STATEMENT

The Government submits this memorandum of law in opposition to defendant Rafael Martinez's motion to dismiss Count One of the Indictment.  Because Count One alleges a fraudulent scheme to obtain money or property—specifically, a fraudulent scheme "to obtain millions of dollars in capital to issue PPP loans and earn lender fees" (Dkt. 18 ("Indictment") ¶ 1)—Martinez's motion is without merit and should be denied.

## BACKGROUND

### A.  The Offense Conduct[1]

#### 1.  Overview

Martinez was the Chief Executive Officer and primary owner of MBE Capital Partners LLC and affiliated companies (together, "MBE").  (Compl. ¶ 9).  Beginning in at least April 2020, Martinez engaged in a variety of fraudulent conduct relating to the Paycheck Protection Program ("PPP"), a forgivable loan program designed to provide emergency financial assistance to Americans who were suffering the economic effects of the COVID-19 pandemic, administered by the U.S. Small Business Administration ("SBA").  (Compl. ¶¶ 9-13, 15).  Broadly viewed, Martinez engaged in two PPP-related schemes.  First, Martinez, through MBE, fraudulently obtained a PPP loan of over $280,000 from the SBA by making false statements regarding, among other things, the number of people employed by MBE and MBE's payroll expenses (the "PPP Loan Scheme").  (Compl. ¶¶ 19-22).  Second, Martinez, through MBE, submitted fraudulent documents and made false statements to the SBA, a life insurance company (the "Company"), and

---

[1]  The facts outlined herein are set forth in the complaint filed against Martinez on February 28, 2022.  (Dkt. 1.) (hereinafter, the "Compl.").

the Federal Reserve in an effort to become a non-bank PPP lender and to obtain more than $900 million in capital to issue PPP loans, resulting in the payment of more than $70 million in fees to MBE (the "PPP Lender Scheme"). (Compl. ¶¶ 24-34). Martinez used these fees to finance a variety of lavish personal expenditures, including the following purchases: a villa in the Dominican Republic for over $10 million; a $3.5 mansion located in New Jersey; membership in a chartered jet service; and several luxury vehicles. (Compl. ¶ 13).

### 2. Background on the PPP Program

The Coronavirus Aid, Relief, and Economic Security ("CARES") Act was enacted on March 29, 2020, and was designed to provide emergency financial assistance to Americans suffering the economic effects caused by the COVID-19 pandemic. (Compl. ¶ 15). One source of relief provided by the CARES Act—and supplemented by the passage of the Paycheck Protection Program and Health Care Enhancement Act—was the authorization of billions of dollars in forgivable loans to small businesses for job retention and certain other expenses through the PPP. (*Id.*) The PPP ended on or about May 31, 2021. (*Id.*).

The PPP allowed qualifying small businesses and other organizations to receive unsecured, SBA-guaranteed loans with a maturity of two years at an interest rate of one percent. (Compl. ¶ 16). While the PPP was overseen by the SBA, individual PPP loans were issued by commercial lenders approved by the SBA, who received and processed PPP applications and supporting documentation, and then made loans using the lenders' own funds, which were guaranteed by the SBA. (*Id.*). Under the terms of the PPP, these loans were required to be put toward payroll costs, mortgage interest, rent, and/or utilities, among other specified expenses. (*Id.*). The PPP allowed the interest and principal on these loans to be forgiven if businesses spent the proceeds on specified expenses within eight weeks of receipt and used at least 75% of the forgiven amount for payroll.

(*Id.*).  Pursuant to the CARES Act, the amount of PPP funds a business was eligible to receive was determined by the number of employees employed by the business and the average associated payroll costs.  (*Id.*).  Businesses applying for a PPP were, as a result, required to provide documentation of their payroll in applying for PPP loans.  (*Id.*).

As described above, the SBA authorized non-bank lenders to issue PPP loans.  In order to become approved as a non-bank PPP lender, lenders were required to attest that, among other things, they had been operating since at least February 15, 2019; they had formal compliance programs relating to auditing and compliance with applicable laws; and that they had originated, maintained, and serviced more than $50 million in business loans or other commercial financial receivables during a consecutive 12-month period over the prior 36 months. (*Id.* ¶ 17).  In addition, applicants were required to submit their most recent fiscal year-end audited financial statements. (*Id.*).

On April 8, 2020, the Board of Governors of the Federal Reserve System authorized each of the regional Federal Reserve Banks to establish and operate the Payment Protection Program Liquidity Facility ("PPPLF").  (*Id.* ¶ 18).  Under the PPPLF, Reserve Banks extended non-recourse credit to SBA-approved lenders that were eligible to originate PPP loans, taking the PPP loans as collateral.  The purpose of the PPPLF was to bolster the effectiveness of the PPP, provide liquidity to credit markets, help stabilize the financial system, and provide relief to small businesses affected by the COVID-19 crisis.  (*Id.*).

### 3.  The PPP Loan Scheme

On or about April 5, 2020, Rafael Martinez the defendant, applied on behalf of Republic Group, LLC, a/k/a Republic Group Parts, LLC ("Republic Group"), d/b/a MBE to an FDIC-insured financial institution ("Bank-1") for a PPP loan; Martinez supplemented that application

with additional information on or about April 15, 2020.  (*Id*. ¶ 19).  In connection with the loan application, Martinez represented that MBE had as many as 15 employees and an average monthly payroll of approximately $119,390 in 2019.  (*Id*. ¶¶ 10, 19).  In order to support those representations, Martinez submitted fraudulent and doctored tax records that contained the forged signature of a tax preparer (the "Tax Preparer").  (*Id*. ¶ 19).  In fact, between April 2018 and April 2020, MBE had at most four employees and an average monthly payroll of no more than $25,000.  (*Id*. ¶ 10).  Based on the false documentation provided by Martinez, Bank-1 issued a PPP loan to MBE in the amount of approximately $283,764, which was disbursed to a bank account controlled by Martinez and a family member.  (*Id*. ¶ 19(d)).  The majority of the loan proceeds appear to have been used for purposes other than MBE's payroll and business expenses.  (*Id.*).

### 4.  The PPP Lender Scheme

In or about April 2020, Martinez submitted an application to the SBA for MBE to become a non-bank PPP lender.  (*Id*. ¶ 11).  As part of the PPP lender application process, Martinez represented that MBE had originated and serviced over $3.8 billion in business loans or other commercial financial receivables for the three-year period from in or about 2017 through in or about 2019, and submitted fraudulent financial statements that purported to be audited by the Tax Preparer's firm for the years 2018 and 2019.  (*Id*. ¶ 11).  Based on the false information provided by Martinez to the SBA, MBE was approved as a non-bank lender for PPP loans on or about April 30, 2020.  (*Id*. ¶ 27).

At or about the same time, Martinez engaged in discussions with the Company in connection with a proposed partnership between the Company and MBE to fund PPP loans for minority and women-owned small businesses.  (*Id*. ¶ 32(a)).  As part of the Company's due diligence on MBE, the Company requested certain documents and information from Martinez.  (*Id*.

¶ 32(a)).  On or about April 27, 2020, Martinez submitted various documents to the Company—including, notably, the same fraudulent 2019 audited financial statements for MBE that were submitted to the SBA.  (*Id.*).  On or about May 13, 2020, Martinez, on behalf of MBE, entered into a participation purchase and servicing agreement with the Company, pursuant to which the Company agreed to provide $100 million to MBE to fund PPP loans that were purchased by the Company and serviced by MBE.  (*Id.* ¶ 32(b)).  Significantly, as part of this agreement, Martinez represented that MBE was in compliance with applicable laws and regulations and had complied with all documentation requirements under the PPP program and SBA regulations.  (*Id.* ¶ 32(b)).  The same day, on or about May 13, 2020, the Company transferred $100 million to a bank account in the name of Republic Group, which was controlled by Martinez and his daughter, to fund the PPP loans to be issued in connection with the partnership between MBE and the Company.  (*Id.* ¶ 32(b)).  Approximately six days later, in a May 19, 2020 CNBC interview, Martinez stated, in substance and in part: "What we're trying to do is make sure we vet everybody to the standards of the SBA and assure that this money goes out because the next step in this procedure is working with a depository bank to multiply [the Company's] investment into a billion dollars or more." (*Id.* ¶ 33).

While Martinez was engaged in discussions with the Company, he also sought advances on pledges of PPP loans issued by MBE through the Federal Reserve's PPPLF.  (*Id.* ¶¶ 12, 34). Based upon MBE's status as an approved PPP lender, and the loan funds MBE obtained from the Company—both of which Martinez had procured based on false representations and doctored documents—the Federal Reserve issued substantial advances to MBE.  Indeed, between approximately June 2020 and July 2021, MBE received 124 capital advances through the PPLF in amounts totaling more than $832 million.  (*Id.* ¶ 34).

Because of the success of the scheme to defraud the SBA, the Company, and the Federal Reserve, MBE was able to issue in excess of approximately $900 million in PPP loans. MBE, and the defendant, reaped substantial financial rewards as a result. (*Id.* ¶ 35). Ultimately, MBE was paid a total of approximately $71.3 million in fees, a significant portion of which Martinez used to pay for extravagant personal expenditures. (*Id.*).

### B. Procedural History

On or about February 28, 2022, Martinez was charged by Complaint, arrested, presented, and released on bail.

On or about May 2, 2022, the grand jury returned the Indictment, charging Martinez in five counts. As relevant here, Count One charges Martinez, in connection with the PPP Lender Scheme, with engaging in wire fraud from approximately April 2020 through at least February 2022, in violation of 18 U.S.C. § 1343. (Indictment ¶ 1). The "to wit" clause of Count One provides: "MARTINEZ used false and fraudulent pretenses, representations, and documents to fraudulently obtain the approval of the [SBA] for his company, [MBE], to be a non-bank lender through the [PPP], and then MARTINEZ used that approval to obtain millions of dollars in capital to issue PPP loans and earn lender fees." (Indictment ¶ 1).

Trial is scheduled for May 1, 2023.

### DISCUSSION

### I. THE DEFENDANT'S MOTION TO DISMISS COUNT ONE SHOULD BE DENIED.

Martinez moves to dismiss only Count One, which charges wire fraud arising out of the PPP Lender Scheme. Martinez's motion asserts that that the "money or property" that is the object of the scheme to defraud alleged in Count One is the SBA's approval of MBE as a non-bank PPP lender; Martinez's motion, thus, rests entirely on the notion that Count One pleads a "theory of government imprimatur as 'property.'" (Dkt. 33 ("Def. Br.") 1). But Martinez's assertion is

8

mistaken. That is not the Government's theory, nor is that what the Indictment alleges. Rather, the "money or property" fraudulently obtained as a result of the scheme alleged in Count One is, simply, "money"—the nearly one billion dollars in fraudulently obtained capital and the resulting tens of millions of dollars in loan fees that accrued to MBE, and to the defendant, as a result of his false statements to the SBA, the Company, and the Federal Reserve. *See* (Indictment ¶ 1 (alleging a fraudulent scheme "to obtain millions of dollars")). Accordingly, Martinez's disquisition on what constitutes "property" under the wire fraud statute (Def. Br. 2-9) is irrelevant. The motion to dismiss Count One should be denied.

## A. Applicable Law

"The dismissal of an indictment is an 'extraordinary remedy' reserved only for extremely limited circumstances implicating fundamental rights." *United States v. Zarrab*, No. 15 CR 867 (RMB), 2016 WL 6820737, at \*2 (S.D.N.Y. Oct. 17, 2016) (quoting *United States v. De La Pava*, 268 F.3d 157, 165 (2d Cir. 2001)). Indeed, it is well-settled that "[a]n indictment returned by a legally constituted and unbiased grand jury . . . if valid on its face, is enough to call for trial of the charge on the merits." *Costello v. United States*, 350 U.S. 359, 363 (1956).

### 1. Pleading Standards

Under the Federal Rules of Criminal Procedure, an indictment "must be a plain, concise, and definite written statement of the essential facts constituting the offense charged" and must include the "statute, rule, regulation, or other provision of law that the defendant is alleged to have violated." Fed. R. Crim. P. 7(c)(1). In other words, "an indictment is sufficient if it 'first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *Hamling v. United States*, 418 U.S. 87, 117 (1974). To state an offense, the Second Circuit has "often stated that an indictment need do little more than to track

the language of the statute charged and state the time and place (in approximate terms) of the alleged crime." *United States v. Stavroulakis*, 952 F.2d 686, 693 (2d Cir. 1992) (internal quotation marks omitted).

When considering whether a count states an offense, "all allegations in the indictment [are taken] as true." *United States v. Aleynikov*, 676 F.3d 71, 76 (2d Cir. 2012). Moreover, the indictment should be read "in its entirety," *United States v. Hernandez*, 980 F.2d 868, 871 (2d Cir. 1992), and "must be read to include facts which are necessarily implied by the specific allegations made," *Stavroulakis*, 952 F.2d at 693 (internal quotation marks omitted). Ultimately, an indictment "need not be perfect, and common sense and reason are more important than technicalities." *United States v. De La Pava*, 268 F.3d 157, 162 (2d Cir. 2001).

Accordingly, a "defendant faces a high standard in seeking to dismiss an indictment" for failure to state an offense. *United States v. Pham*, No. 12 Cr. 423 (AJN), 2022 WL 993119, at *3 (S.D.N.Y. Apr. 1, 2022) (internal quotation marks omitted). Where, as here, the charging instrument meets the basic requirements, dismissal is an "extraordinary remedy reserved only for extremely limited circumstances implicating fundamental rights." *United States v. De La Pava*, 268 F.3d 157, 165 (2d Cir. 2001) (internal quotation marks omitted).

### 2. Wire Fraud

Title 18, United States Code, Section 1343 provides, in pertinent part, that "[w]hoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire . . . in interstate or foreign commerce . . . any writings, signs, [or] signals . . . for the purpose of executing such scheme or artifice," is guilty of a crime.

10

"[T]he essential elements of a mail or wire fraud violation are (1) a scheme to defraud, (2) money or property as the object of the scheme, and (3) use of the mails or wires to further the scheme." *Fountain v. United States*, 357 F.3d 250, 255 (2d Cir. 2004) (internal quotation marks and brackets omitted).  Wire fraud "is limited in scope to the protection of property rights." *McNally v. United States*, 483 U.S. 350, 360 (1987).  Thus, to prove a violation of the wire fraud statute, the Government need "show not only that" a defendant "engaged in deception, but that an 'object of the[ir] fraud [was] property.'" *Kelly v. United States*, 140 S. Ct. 1565, 1571 (2020) (quoting *Cleveland v. United*, 531 U.S. 12, 26 (2000)).  While money or property must be the scheme's object, there is no requirement that "the party whose money or property is the object of the scheme is the same party whom a fraudster seeks to deceive." *United States v. Greenberg*, 835 F.3d 295, 306 (2d Cir. 2016).

**B.  Discussion**

Martinez seeks to dismiss Count One of the Indictment, because, according to the defendant, Count One pleads a prosecutorial "theory of government imprimatur as 'property.'" (Def. Br. 1).  Relying principally on the Supreme Court's decision in *Cleveland*, Martinez argues that the "SBA's right to approve an applicant as a non-bank lender under the PPP" is not "property" for purposes of the wire fraud statute. (*Id.* at 9).  Even assuming, *arguendo*, that Martinez is correct about *Cleveland*'s application to the SBA's PPP lender approvals—an issue this Court need not reach on the instant motion—his motion should still be denied, because Martinez simply misstates the Government's theory and the object of the fraud alleged in Count One. [2]

---

[2] In seeking to dismiss Count One, Martinez does not argue—nor could he—that the Indictment suffers from any pleading deficiency, nor that it fails in any way other than that articulated above to meet the lenient standards for stating the offense of wire fraud.  Indeed, Count One "track[s] the language of the statute charged and state[s] the time and place (in approximate terms) of the alleged

11

Contrary to Martinez's cramped reading of Count One of the Indictment, Count One charges an interconnected scheme to defraud others of money whereby Martinez enriched himself enormously. In particular, Count One charges a scheme deceive the SBA, the Company, and the Federal Reserve in order to obtain "millions of dollars" in capital and lender fees.[3] (Indictment ¶ 1). While the defendant took numerous steps in furtherance of that scheme—including, among others, making false representations to the SBA in order to become certified as a PPP lender—the object of the scheme was profit. Put differently, the "money or property" that the Indictment alleges as the object of Martinez's fraud is, simply, "money." As the defendant himself observes, the meaning of "'[m]oney' largely speaks for itself." (Def. Br. 3). The Government agrees. Thus, Martinez's lengthy discussion of *Cleveland* and its predecessors and progeny, along with his arguments that a governmental license does not qualify as "property" (Def. Br. 2-11), are all beside the point.

---

crime." *Stavroulakis*, 952 F.2d at 693. It "fairly inform[s the] defendant of the charge against which he must defend" and "enable[s] him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *Hamling*, 418 U.S. at 117. And it includes "a plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1).

[3] While Count One's "to wit" clause did not specify *all* the particulars of how and from whom Martinez fraudulently obtained millions of dollars, the Government is not required to plead such specifics in the Indictment. *See, e.g.*, *United States v. Bastian*, 770 F.3d 212, 221 (2d Cir. 2014) ("[W]e have never suggested that a 'to wit' clause binds the government to prove the exact facts specified in a criminal indictment."). Moreover, Martinez does not complain about any lack of specifics in the allegations set forth in Count One, nor has he filed a motion for a bill of particulars, the proper avenue for such a complaint. *See United States v. Navarro*, 551 F. Supp. 3d 380, 390 (S.D.N.Y. 2021). Indeed, the Indictment, particularly when read in conjunction with the detailed Complaint and discovery materials, leaves no mystery as to the crimes and conduct charged. *See United States v. Stringer*, 730 F.3d 120, 123–25 (2d Cir. 2013); *United States v. Walsh*, 194 F.3d 37, 45 (2d Cir. 1999); *Stavroulakis*, 952 F.2d at 693.

12

Indeed, *Cleveland* is inapposite to this case for at least two reasons.[4]  First, unlike here, the prosecution in *Cleveland* did not allege that there was a scheme to defraud "any money." *Cleveland*, 531 U.S. at 22 ("[T]he Government nowhere alleges that Cleveland defrauded the State of any money.").  Second, the defendant in *Cleveland* did not defraud a private, non-governmental entity of money.  Here, Martinez not only defrauded the Federal Reserve of "money," he also defrauded a private entity, the Company, of $100 million.  To state the obvious, deceiving a private company in order to obtain its money, as Martinez did here, has absolutely nothing to do with the "'paradigmatic exercises of the [government's] traditional police powers.'"  (Def. Br. 10 (quoting *Cleveland*, 531 U.S. at 23)).  In short, because Count One alleges a fraudulent scheme to obtain "money," Martinez's motion should be denied.

In this motion, the defendant attempts to ignore the plain allegation in the Indictment that money was the object of the charged scheme and to cast the scheme instead as an effort to defraud the SBA alone.  However, putting "common sense and reason" above "technicalities," *De La Pava*, 268 F.3d 157, 162, and "includ[ing] facts which are necessarily implied by the specific allegations made," *Stavroulakis*, 952 F.2d at 693, Count One is properly read to allege that Martinez made false statements to the SBA and the Company, and relied on false pretenses—MBE's supposed status as a legitimate PPP lender—to obtain money from both the Company and the Federal Reserve.  The fact that Count One is predicated, in part, upon false statements made to the SBA does nothing to undermine the validity of the wire fraud charge.  The Second Circuit has "never

---

[4] The Government also notes that *Cleveland* involved only state (as opposed to federal) regulatory acts, and the Supreme Court cited federalism concerns in its reasoning.  *See* 531 U.S. at 24 ("We resist the Government's reading of § 1341 as well because it invites us to approve a sweeping expansion of federal criminal jurisdiction in the absence of a clear statement by Congress . . . [to] a wide range of conduct traditionally regulated by state and local authorities.").

13

read the wire and mail fraud statutes as limited to schemes in which the party whose money or property is the object of the scheme is the same party whom a fraudster seeks to deceive." *Greenberg*, 835 F.3d at 306.  In *Greenberg*, the defendant was charged with wire fraud based on a scheme to make unauthorized credit card charges on the credit cards of customers of his digital retail company and moved to dismiss the wire fraud counts based on his having lied to banks and credit card processors, but not to customers.  *Id.* at 297, 305-06.  The Second Circuit rejected that challenge, writing that the wire fraud statute was "'broad enough to include a wide variety of deceptions intended to deprive another of money or property' and '[w]e see no reason to read into the statutes an invariable requirement that the person deceived be the same person deprived of the money or property by the fraud.'"  *Id.* at 306 (quoting *United States v. Christopher*, 142 F.3d 46, 54 (1st Cir. 1998)).  As in *Greenberg*, the fact that the defendant in the instant case is alleged to have lied to the SBA, among others, in an effort to obtain money from the Company and the Federal Reserve does nothing to undermine the validity of the wire fraud charge as pled in Count One.  *See Greenberg*, 835 F.3d at 305-06.

Martinez also attempts to cast the seeking of money from the Company and the Federal Reserve as an after-the-fact, properly conducted effort, following upon the deception of the SBA. Indeed, the defendant summarily asserts that millions of dollars in "capital and fees flowed from Mr. Martinez's proper participation in the [PPP] program *once approved*."  (Br. 11 (emphasis in original); *see also id.* at 11-12 (further asserting that "Martinez carried out the tasks of a non-bank lender" properly as "he processed loans he received from small, minority-owned businesses, received and immediately disbursed funds as required under the program, and received lender fees for doing so (just as any other non-bank lender (or any bank lender) would receive for doing so).").  But such assertions ignore the actual allegations in the Indictment, while seeking to assert facts

14

outside the Indictment—specifically, that the defendant properly carried out his duties as a PPP lender.  That alone is a sufficient basis to reject them.  *See United States v. Gatto*, 295 F. Supp. 3d 336, 341 (S.D.N.Y. 2018) (rejecting arguments in a motion to dismiss that "disregard allegations contained in the indictment, depend upon assertions outside the indictment, are premature, or all three").  Moreover, this reading of the Indictment strains credibility.  The Indictment clearly alleges that the deception of the SBA to obtain approval as a PPP lender was a precondition to the defendant's having "used that approval to obtain millions of dollars in capital to issue PPP loans and earn lender fees."  (Indictment ¶ 1).[5]

In sum, Count One clearly alleges a scheme to defraud others of money.  "[O]n its face," that is a wire fraud, and "enough to call for trial of the charge on the merits." *Costello*, 350 U.S. at 363.  Conversely, Martinez has not met the "high standard" for dismissal, *Pham*, 2022 WL 993119, at *3, an "extraordinary remedy reserved only for extremely limited circumstances implicating fundamental rights," *De La Pava*, 268 F.3d at 165.  Accordingly, Martinez's motion should be denied.

---

[5] While not specifically alleged in the Indictment, the Complaint makes clear, and the Government expects to prove at trial, that Martinez falsely represented to the Company that MBE was in compliance with applicable laws and regulations and had complied with all documentation requirements under the PPP program and SBA regulations, in order to obtain the $100 million of loan funding from the Company.  (Compl. ¶ 32).

## **CONCLUSION**

For the reasons set forth above, the motion to dismiss Count One should be denied.

Dated:  New York, New York
        December 23, 2022

                                        Respectfully submitted,

                                        DAMIAN WILLIAMS
                                        United States Attorney


                            By:      /s/
                                        Micah F. Fergenson
                                        Katherine Reilly
                                        Assistant United States Attorneys
                                        (212) 637-2190/6521

16