

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

February 10, 2023

**BY ECF**
The Honorable Lewis J. Liman
United States District Judge
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, New York 10007

> **Re:    *United States v. Rafael Martinez*, S1 22 Cr. 251 (LJL)**

Dear Judge Liman:

The Government submits this letter in opposition to defendant Rafael Martinez's motion to dismiss Count One of the Superseding Indictment. For the reasons set forth both below and in the Government's Opposition to the Defendant's Motion to Dismiss Count One of the originally returned Indictment, dated December 23, 2022, the defendant's motion is without merit and should be denied.

## I.    The Superseding Indictment Is Legally Sufficient.

Count One of the Superseding Indictment alleges, *inter alia*, that from in or about April 2020 through at least in or about February 2022, Martinez:

> engaged in a scheme to fraudulently obtain millions of dollars in capital from an insurance company ("the Company") and the Federal Reserve Bank of San Francisco, in order to issue loans through the Paycheck Protection Program (the "PPP"), and thereby to fraudulently earn PPP lender fees, through false and fraudulent pretenses, representations, and documents, including by making false statements to the United States Small Business Administration (the "SBA") in order to obtain approval for MARTINEZ's company, MBE Capital Partners, LLC ("MBE"), to become a non-bank PPP lender.

(Superseding Indictment ¶ 1).

The allegations contained in Count One are more than sufficient at this stage. It is well-settled that "an indictment is sufficient if it 'first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables

him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *Hamling v. United States*, 418 U.S. 87, 117 (1974). As a result, "an indictment need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime." *United States v. Stavroulakis*, 952 F.2d 686, 693 (2d Cir. 1992) (internal quotation marks omitted). Count One clearly informs the defendant of the crime with which he is charged, the elements of that crime, and the approximate time and place of the commission of the crime. As such, it satisfies the pleading standards required on a motion to dismiss. *See Stavroulakis*, 952 F.2d at 693.

In seeking to dismiss Count One, the defendant claims—contrary to the plain language of the allegations in the Superseding Indictment—that the gravamen of the charge is the deception of the SBA to obtain approval of MBE as a PPP lender. To the contrary, Count One charges a scheme to defraud the Company, the Federal Reserve, and the SBA of millions of dollars in capital for PPP loans and associated lender's fees.[1] This is a case, then, about money, not about regulatory approvals. As set forth below, the defendant's motion fails for two reasons. First, Count One properly pleads a wire fraud in which the defendant's false statements to the SBA were one of the mechanisms by which he obtained the illicit proceeds at issue. Second, Count One is not predicated only upon the false statements to the SBA, nor need all of the means of the fraud to be proved at trial be set forth in the Superseding Indictment. As a result, the defendant's motion to dismiss should be denied.

   A. *Count One Properly Pleads a Wire Fraud Executed, In Part, By Means of the Defendant's False Statements to the SBA.*

Assuming, *arguendo*, that Count One charged a fraud predicated *only* on false statements to the SBA in the course of seeking approval as a non-bank PPP lender—which, as set forth below, is not what is plead in the Superseding Indictment, nor the entirety of what the Government intends to prove at trial—the defendant's motion should be denied. The false statements to the SBA alleged in Count One were the "means of" the defendant's obtaining the money that was the object of his scheme.

---

[1] The defendant critiques the Government's recitation of the scheme as "adopt[ing[ the kitchen sink approach." (Def. Br. at 2). What the defendant views as "the kitchen sink," might be better characterized as a complex and multi-faceted scheme to defraud. The defendant's goal was simple—to obtain millions of dollars to which he was not entitled. The scheme he deployed to achieve that goal was, by necessity, far less straightforward. In order to be eligible to seek PPP capital from the Federal Reserve—and to partner with the Company—the defendant had to be able to represent that his company could issue PPP loans; that required obtaining approval of the SBA as a PPP lender. Only having done that could the defendant collect capital from the Company and the Fed and, only after having used that capital to issue PPP loans could he collect fees from the SBA.

1.  The Government Has Properly Alleged that the False
    Statements to the SBA are a "Means Of" the Charged Wire Fraud.

In his most recent letter, the defendant relies heavily on the Supreme Court's opinion in *United States v. Loughrin*, 573 U.S. 351 (2014), in arguing that the alleged false statements to the SBA are too attenuated from the capital obtained from the Company and the Federal Reserve, and the lender fees obtained from the SBA, for those false statements to be the "means of" the charged fraud.[2]  (Def. Ltr. at 3-5).

In *Loughrin*, the Supreme Court upheld the defendant's conviction, following a jury trial, on bank fraud charges, holding that intent to defraud a financial institution is not a requisite element of bank fraud, as charged under 18 U.S.C. § 1344(2).  573 U.S. at 353-55.  The Court noted that the statute does require that the "criminal must acquire (or attempt to acquire) bank property 'by means of' the misrepresentation," writing that the phrase "by means of" "typically indicates that the given result (the 'end') is achieved, at least in part, through the specific action, instrument, or method (the 'means'), such that the connection between the two is something more than oblique, indirect, and incidental."  *Id.* at 362-63.  The Court made clear this requirement does not mean that the misrepresentation must be made directly to the bank; to the contrary, it held that counterfeit checks submitted to a retailer as payment for goods—and then passed along to a bank for payment, triggering the disbursement of bank funds—"serve[] in the ordinary course as the means (or to use other words, the mechanism or instrumentality) of obtaining bank property."  *Id.* at 363-64.

Under the standards articulated in *Loughrin*, the determination of whether a false statement is the "means of" obtaining property requires a fact-specific analysis of the "causal connection" between the false statements and the property.  *See United States v. Berroa*, 856 F.3d 141, 152-54 (1st Cir. 2017) (distinguishing *Loughrin* on the grounds that "the causal connection [between the false statements and the property obtained] is much more attenuated in the present case" and noting that the *Loughrin* court made clear "the importance of context" to the inquiry).  Such an inquiry is wholly inappropriate on a motion to dismiss, in the absence of any evidentiary record; indeed, both *Loughrin* and *Berroa* evaluated the "causal connection" only after convictions at trial.  Here, the Government has alleged a causal connection, namely that the scheme to defraud was effectuated through a variety of false representations and pretenses, including the statements to the SBA.  Those allegations must be taken as true, *see United States v. Goldberg*, 756 F.2d 949, 950 (2d Cir. 1985), and are sufficient on a motion to dismiss.

The Court need not further inquire into the causal relationship between the defendant's false statements to the SBA and the property he obtained at this stage.  Any such inquiry, though, demonstrates that the relationship in this case is more than sufficient to sustain a charge of wire

---

[2]  The defendant does not dispute that in the Second Circuit, there is no requirement that "the party whose money or property is the object of the scheme is the same party whom a fraudster seeks to deceive."  *United States v. Greenberg*, 835 F.3d 295, 306 (2d Cir. 2016).  Accordingly, false statements to the SBA *can* be the basis of a scheme to defraud other entities, here the Federal Reserve and the Company.  *See id.*

Hon. Lewis J. Liman                                                                    Page 4
February 10, 2023

fraud. The connection between the defendant's false statements to the SBA and the property that was the object of his fraud—capital obtained from the Company and the Federal Reserve, and the resulting lender's fees paid by the SBA itself—is substantially "more than oblique, indirect, and incidental." *See Loughrin*, 573 U.S. at 362-63. Here, the defendant is charged with submitting fraudulent documents and making false statements to the SBA, with the express goal of becoming certified as a PPP lender; the direct and natural result of having deceived the SBA—indeed, the only plausible reason for the defendant to do so—is to obtain capital to issue PPP loans, and to collect associated fees. Furthermore, the SBA is not some remote licensing authority, disconnected from the work being carried out after approval is issued; indeed, the SBA administered the PPP program, guaranteed the very loans funded by the Federal Reserve and the Company, and paid fees to the lenders issuing those loans. As a result, the SBA's approval of MBE as a non-bank lender directly and immediately impacted MBE's ability to obtain funds and earn fees; the Federal Reserve, for example, relied on the SBA's certification of non-bank lenders in issuing capital through the Payment Protection Program Liquidity Facility. *See* (Cmplt. ¶ 18).

The Sixth Circuit's recent decision in *United States v. Palma*, No. 21-1782, 2023 WL 241834 (6th Cir. Jan. 18, 2023), is instructive. The defendant in that case conspired to falsify test results for a new diesel engine and to market the engine as environmentally friendly and "best in class," with the ultimate object of obtaining money from the consumers who purchased the cars in which the engines had been installed. *Id.* at *1. The district court granted a motion to dismiss on the grounds that "there was an insufficient causal nexus between Palma's conduct and customers being induced to purchase vehicles." *Id.* at *2. On appeal, the Sixth Circuit reversed, finding that the indictment had alleged "a sufficient causal nexus between the conduct of Palma and co-conspirators and a deprivation of property." *Id.* at *3-5. The court emphasized, among other things, that the decision came at the pleading stage, such that "the government need only allege facts showing that the conspiracy as a whole had the object of using deception to deprive consumers of property," and the court did "not test the evidence behind [the government's] claims." *Id.* at *3 (distinguishing *Kelly v. United States*, 140 S. Ct. 1565 (2020), because "*Kelly* took place in post-conviction proceedings, whereas Palma challenges an indictment," and the "property loss [in *Palma*] is much more significant than the loss in *Kelly* and much more connected with the alleged scheme").

The *Palma* Court also distinguished *Berroa*, a case in which the First Circuit reversed convictions for mail fraud based on *Loughrin*. *Palma*, 2023 WL 241834, at *4. In *Berroa*, the defendants were charged with mail fraud based on having falsified test scores to obtain medical licenses, which they then used "in the ensuing years after becoming licensed" to "practice[] medicine for profit." 856 F.3d at 152. The First Circuit found an insufficient causal nexus between the falsified test scores and the profit, nothing that "the defendants' alleged fraud in obtaining their medical licenses cannot be said to have 'naturally induced' healthcare consumers to part with their money *years later*." *Id.* at. 150 (emphasis added). In distinguishing *Berroa*, the Sixth Circuit noted that "where the purpose of fraudulently obtaining medical licenses was to practice medicine, the goal of 'cycle beating' and falsely inflating the engines' performance"—the deception alleged in *Palma*—was "to induce customers who otherwise would not have bought vehicles to do so." *Palma*, 2023 WL 241834, at *4 (internal citations omitted). The court continued that, "[u]nlike

Hon. Lewis J. Liman                                                                    Page 5
February 10, 2023

*Berroa*, the case at bar is clearly about property.  And it is plausible that the scheme's goal was not merely to deceive regulators but also to sell the resulting products to consumers." *Id.*

Like *Palma*, the instant case is, without question, a case "about property"—the millions of dollars in PPP loans and associated fees that flowed to the defendant through MBE.  *See Palma*, 2023 WL 241834, at *4.  And it is well beyond "plausible"—indeed, it is the only logical conclusion to be drawn—that the goal of the defendant's false statements to the SBA in the course of obtaining approval as a non-bank PPP lender was not merely to deceive the SBA for its own sake, but to put the defendant and MBE in a position to collect those millions of dollars, a position he could not be in if the SBA did not approve MBE as a lender.  *See id.*  Indeed, unlike in *Berroa*, where years passed between the false statements and the profit, here, the defendant's application to the SBA and efforts to obtain capital from the Company and the Fed were nearly contemporaneous.  The defendant's claims that his goal in applying to the SBA "was to obtain the permission of the SBA for MBE to serve as a non-bank lender" and "not to obtain money from the Company or the Federal Reserve," (Def. Br. at 5), strain credulity.  His attempt to artificially divorce the process of obtaining approval as a lender from obtaining capital to fund loans, and collecting associated fees, processes taking place at essentially the same time, rings hollow.

Regardless, a motion to dismiss is simply not an appropriate vehicle for such claims.  The Court should not accept the defendant's invitation to evaluate the facts, whether as to his intentions or the legitimacy—or lack thereof—of the operations of his business; those are matters for a jury and, once a jury has decided, for post-trial motions, not for a motion to dismiss.  *See United States v. Dawkins*, 999 F.3d 767, 779-80 (2d Cir. 2021) (upholding the denial of a motion to dismiss and rejecting the defendants' suggestion that the court should have "weighed whether certain factual allegations in the Superseding Indictment…were consistent with the charged violations" because "we do not evaluate the adequacy of the facts to satisfy the elements of the charged offense" until "after trial").

      2.   The Millions of Dollars in Capital to Fund PPP Loans—
           and the Resulting Lenders' Fees Paid to the Defendant's
           <u>Company—Satisfy the "Money or Property" Element of Wire Fraud.</u>

Relying on three decisions assessing convictions after trial, on fully developed evidentiary records—and not governed by the standards on a motion to dismiss—the defendant argues that the funds obtained from the Company and the Federal Reserve, and the resulting lenders' fees paid by SBA, cannot be the "money or property" that is the object of a wire fraud. (Def. Br. at 6-7).  The cases relied on by the defendant are inapposite.  Not only do they involve assessments of post-trial evidentiary records, but they also deal with underlying facts substantially and meaningfully distinct from those of the instant case.

First, the defendant relies upon *Cleveland v. United States*, 531 U.S. 12 (2000), in which the Supreme Court vacated convictions for mail fraud based on the defendants' false statements in an application, submitted to the state of Louisiana, for a license to operate video poker machines. *Id.* at 15-17.  In concluding that the video poker licenses were not "property" in the hands of Louisiana regulators, the Court noted that "the State's core concern [in issuing video poker

licenses] is regulatory; in doing so, the Court analyzed the statutory scheme underlying the licensing process and concluded that its particular structures constituted "a typical regulatory program…[that] resembles other licensing schemes long characterized by this Court as exercises of state police powers." *Id.* at 20-21.  The Court also noted that "Louisiana cannot be said to have put its labor or capital at risk through its fee-laden licensing scheme.  In short, the State did not decide to venture into the video poker business; it decided typically to permit, regulate, and tax private operators of the games." *Id.* at 24.

The decision in *Cleveland*, thus, was predicated upon "the nature of the specific licensing scheme at issue" in that case.  *See United States v. Huff*, No. 12 Cr. 750 (NRB), 2015 U.S. Dist. LEXIS 13355, at *19 (S.D.N.Y. Feb. 4, 2015).  It was also based, in large part, on the Court's conclusion that the economic components of the licensing program were post-hoc and not the program's core purpose. *Cleveland*, 531. U.S. at 22-23; *see also Pasquantino v. United States*, 544 U.S. 349, 356-57 (2005) (finding that Canada's interest in collecting tax revenue constituted "property" was a more "straightforward 'economic' interest" than that present in *Cleveland*); *Huff*, 2015 U.S. Dist. LEXIS 13355, at *12-20 (denying a motion to dismiss based on an effort to fraudulently obtain approval of an insurance company purchase from a state regulator because the relevant regulations were "economic in both purpose and practice").

The facts at issue here are readily distinguishable from *Cleveland*.  Indeed, the SBA's approval of non-bank PPP lenders was a fundamentally *economic* decision; the SBA was selecting lenders to review, underwrite, and approve loans that were to be guaranteed by the SBA, and on which lender fees were to be paid by the SBA, putting the SBA's "fisc" squarely on the line.  Its ability to rely upon the statements made by applicants to become lenders—and to ensure that those applicants were equipped to assess applicants for PPP loans and to underwrite those loans—was crucial to protecting its own economic interests as guarantor of the loans.  In *United States v. Huff*, Judge Buchwald denied a motion to dismiss charges alleging a scheme to defraud Oklahoma's Insurance Department in connection with obtaining approval of the purchase of an insurance company, focusing on the economic nature of the state's insurance regulations, including that they were "designed to avoid insurance companies' insolvency in order to safeguard state funds that would inevitably be spent in processing the companies' liquidation and receivership and in satisfying policyholder claims," such that the "approval scheme might perhaps be best characterized as revenue-protective."  2015 U.S. Dist. LEXIS 13355, at *19-20.  As in *Huff*, the SBA's approval process—like that of the Oklahoma Insurance Department—is "economic in both purpose and practice" and, insofar as it directly affected who issued loans guaranteed by the SBA, and who was paid lender fees by the SBA, was "revenue-protective."  *See id.*

Separate and apart from the SBA's economic interests, the core purpose of the approval process at issue here was economic—to vet underwriters and issuers of government-guaranteed loans.  Thus, the other deceived parties—the Federal Reserve and the Company—naturally relied on the approval in granting MBE capital, in a way significantly more direct and significant than consumers of video poker machines might have relied upon Louisiana's licensing process—if, indeed, they did so at all—in *Cleveland*.

Second, the defendant cites *Kelly v. United States*, 140 S. Ct. 1565 (2020), in which the Supreme Court overturned the convictions of two Port Authority of New York and New Jersey officials who—for political reasons—rerouted traffic to reduce the access points from Fort Lee, New Jersey on to the George Washington Bridge. *Id.* at 1568-69. The Court found that the "realignment of the toll lanes was an exercise in regulatory power" and that the cost to the Port Authority of the additional labor that resulted—in the form of extra toll takers and traffic engineers—"was just the incidental cost of that regulation, rather than itself an object of the officials' scheme." *Id.* at 1568-69, 1572. The Court held that the property in a wire fraud scheme "must play more than some bit part in a scheme," and cannot be "only an incidental byproduct of the scheme." *Id.* at 1573.

The Supreme Court's holding makes clear how different *Kelly* is from the instant case. Here, the PPP loan funds and lender fees do not play a "bit part" in the scheme alleged; indeed, despite his protestations, the defendant's purpose in seeking approval as a non-bank PPP lender was to procure capital and to earn fees, which he began to do almost contemporaneously with seeking approval. Unlike in *Kelly*, where the primary goal of the fraudulent actions taken was political retribution, the object here was money.[3] *See Palma*, 2023 WL 241834 at *3 (distinguishing *Kelly* because "*Kelly* took place in post-conviction proceedings," and the "property loss [in *Palma*] is much more significant than the loss in *Kelly* and much more connected with the alleged scheme").

Finally, contrary to the defendant's contentions, nothing about the Second Circuit's decision in *United v. Blaszcak*, 56 F.4th 230 (2d Cir. 2022) affects the viability of Count One. In *Blaszcak*, the Second Circuit vacated convictions on certain counts predicated upon the defendants' misappropriation of confidential government information, finding that that information, and the timing of its release, were not the government's property. *Id.* at 243-44. The Government conceded as much, taking the position that "'confidential government information…typically must have economic value in the hands of the relevant government entity to constitute 'property''[.]" *Id.* at 236 (quoting the Government's brief on remand). The court noted, further, that the defendants' conduct in *Blaszcak*—the premature disclosure of confidential information to others—"has no direct impact on the government's fisc" and affected only "regulatory choices," much like the conduct in *Kelly*. *Id.* at 244. This case, of course, has nothing to do with confidential information and its casting as property, or not; here, the property at issue is money—capital and fees. Additionally, as set forth above, the "impact on the government's fisc" is clear—the SBA guaranteed the PPP loans issued by the defendant's company, and funded by the Company and the Fed, and paid fees on those loans. Thus, *Blaszcak* is wholly distinguishable form the instant case.

---

[3] Indeed, even in *Kelly*, the Supreme Court explicitly recognized that a government's interest in its own financial resources was a property interest for purposes of a fraud prosecution. *See* 140 S. Ct. at 1573 ("A government's right to its employees' time and labor, by contrast, can undergird a property fraud prosecution.…[T]he cost of those employees' services would qualify as an economic loss to a city, sufficient to meet the federal fraud statutes' property requirement. No less than if the official took cash out of the city's bank account would he have deprived the city of a valuable entitlement.") (internal quotations and citations omitted).

B. *The Defendant's Reliance on a Narrow Reading of the "To Wit" Clause in Count One Is Both Incorrect and Inappropriate on the Instant Motion.*

As set forth above, Count One properly pleads a wire fraud predicated upon, in part, the defendant's false statements to the SBA. But in seeking to dismiss Count One, the defendant focuses only on those false statements, narrowly reading the "to wit" clause of Count One in a way that is impermissible at this stage of the case.

The defendant likewise focused on the "to wit" clause in his initial motion to dismiss, arguing that Count One as originally drafted charged a scheme by the defendant to defraud the SBA, with the limited object of obtaining approval of MBE as a non-bank PPP lender. As set forth in the Government's December 22, 2023 brief, Count One of the originally-returned Indictment was also legally sufficient, and the Government was not—and is not—required to set forth in the "to wit" clause the precise facts it intends to prove at trial. *See United States v. Bastian*, 770 F.3d 212, 221 (2d Cir. 2014) ("[W]e have never suggested that a 'to wit' clause binds the government to prove the exact facts specified in a criminal indictment."); *United States v. Sullivan*, No. 02 Cr. 1144 (BSJ), 2004 U.S. Dist. LEXIS 1838, at *11 (S.D.N.Y. Feb. 5, 2004) ("There is no precedent that requires that indictments identify each and every statement the Government might argue at trial is false."); *see also United States v. Maalouf*, 514 F. Supp. 851 (E.D.N.Y. 1981) (denying a motion to dismiss where the indictment tracked the statutory language and was facially valid because the "'Government is not required to set forth evidentiary matter.' Precisely how the government will seek to prove its legally sufficient allegations is a question whose resolution must await trial.") (quoting *United States v. Carr*, 582 F.2d 242, 244 (2d Cir. 1978)).

The Government nevertheless sought the Superseding Indictment—with its revised "to wit" clause—in an effort to eliminate the ambiguity the defendant claimed existed as to the Government's theory of the charged wire fraud. Now, in the Superseding Indictment, the "to wit" clause plainly alleges a scheme to defraud the Company and the Federal Reserve Bank of San Francisco of millions of dollars in PPP loan funding—and to collect the associated PPP lender fees, paid by the SBA—through false and fraudulent pretenses, representations, and documents, one category of which are the false statements made by the defendant to the SBA in the course of obtaining approval to become a non-PPP lender.

Despite the Superseding Indictment clearly alleging a scheme to defraud the Company and the Federal Reserve of millions of dollars, and to collect the resulting lender fees from the SBA, the defendant nevertheless persists in his ill-founded motion to dismiss, ignoring nearly the entirety of the revised "to wit" clause, and focusing instead on a small portion of that clause, which sets forth only one example of false statements made in furtherance of the fraud. In doing so, the defendant constructs a strawman to argue against—contending, once again, that the Government's theory of wire fraud relies only on the false statements to the SBA seeking approval as a non-bank PPP lender. To the contrary, as articulated in the Superseding Indictment, the Government intends to prove a fraud executed through a variety of false statements and documents. The Government is not required to list all of the false representations, documents, and statements made in furtherance of the charged fraud in the Indictment, nor is the absence of such an exhaustive list a

reason for dismissal. *See, e.g.*, *Daugerdas v. United States*, No. 09 Cr. 581 (WHP), 2021 U.S. Dist. LEXIS 28578, at *19-20 (S.D.N.Y. Feb. 16, 2021) (rejecting a claim of ineffective assistance of counsel based on a failure to argue that a mail fraud count did not specify the false mailings and noting that "courts in this District have held that an indictment for mail fraud need not identify the victim, the exact mailing dates, or which materials are alleged to be fraudulent") (internal quotations omitted); *United States v. Klein*, No. 03 Cr. 1471 (HB), 2004 U.S. Dist. LEXIS 9672, at *11-12 (S.D.N.Y. May 27, 2004) (denying a motion to dismiss a charge of bank fraud based, in part, on the defendant's claims that particular falsehoods were not specified and noting that "[t]he defendants' claims are certainly not new; indeed, courts in this District have long rejected precisely this type of challenge"); *Sullivan*, 2004 U.S. Dist. LEXIS 1838, at *11 (denying a motion to dismiss an indictment charging a variety of securities and bank fraud offenses and holding that "no precedent that requires that indictments identify each and every statement the Government might argue at trial is false").

* * *

Accordingly, for the reasons set forth above, the defendant's motion to dismiss should be denied.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

by: _____
Katherine Reilly
Micah F. Fergenson
Assistant United States Attorneys
(212) 637-6521/2190

cc: Defense Counsel (By ECF)